RENDERED: MARCH 27, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0665-ME

K.R.W. APPELLANT

APPEAL FROM WARREN CIRCUIT COURT
v. FAMILY COURT DIVISION
HONORABLE CATHERINE R. HOLDERFIELD, JUDGE
ACTION NO. 23-AD-00134

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; K.M.W.; AND
K.M.W., A MINOR CHILD APPELLEES

AND

NO. 2025-CA-0668-ME

K.R.W. APPELLANT

APPEAL FROM WARREN CIRCUIT COURT
v. FAMILY COURT DIVISION
HONORABLE CATHERINE R. HOLDERFIELD, JUDGE
ACTION NO. 23-AD-00133

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; K.M.W.; AND
K.M.W., A MINOR CHILD                                              APPELLEES


OPINION
AFFIRMING

\*\* \*\* \*\* \*\* \*\*

BEFORE:  EASTON, ECKERLE, AND MCNEILL, JUDGES.

EASTON, JUDGE:  Appellant, K.R.W. (Mother) challenges the orders of the

Warren Family Court which terminated her parental rights to two minor children

(Children).  Mother's counsel filed an *Anders*[1] brief in accordance with *A.C. v.*

*Cabinet for Health and Family Services*, 362 S.W.3d 361 (Ky. App. 2012), along

with a motion to withdraw as counsel.  Mother has filed her own supplemental

brief.  After a thorough review of the record, we affirm the Orders of the Warren

Family Court.  We also grant Mother's counsel's motion to withdraw by separate

order.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 20, 2022, Lauren Scipoini (Scipoini) with the Cabinet for

Health and Family Services (Cabinet) received a referral that Mother's toddler,

---

[1] *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).

female child had a concerning and untreated rash on her buttocks and genital area. There had also been a referral that Children (the female child being just under two years of age and the male child being almost four years of age) had been left home alone. Scipoini contacted Mother and advised her she needed to take the child to be seen by a doctor. Mother responded that she did not have transportation and would be unable to do so. After consulting with her supervisor with the Cabinet, Scipoini sought and received an Emergency Custody Order from the Warren Family Court to take custody of Children. A Dependency, Neglect, and Abuse (DNA) petition was filed simultaneously.

When Scipoini arrived to take custody of Children, an officer from the Bowling Green Police Department was already at the home. When Scipoini attempted to remove the Children, Mother assaulted Scipoini. Mother was arrested. A Cabinet supervisor was called to complete the removal, as Scipoini needed to seek medical attention for her injuries sustained during Mother's assault. Scipoini had a concussion, bruises, and needed two staples in her scalp. Mother was charged with Third-Degree Assault, later pled guilty, and received a two-year sentence.

Mother signed an initial case plan with Cabinet worker Casey Logsdon (Logsdon) in May 2022. The tasks on this case plan included completing a psychological assessment and following all recommendations, complete a

Batterers Intervention Program (BIP), complete parenting classes, be involved in no domestic violence, maintain stable housing for a minimum of six months, cooperate with court orders and the Cabinet, and participate in supervised visitation.

An Adjudication Hearing was held on the underlying DNA petition on July 22, 2022. The family court made an ultimate finding of abuse or neglect, and it made detailed findings of fact. The family court determined that there was credible testimony that Children had been left unsupervised, that the younger child had a concerning rash that was not being treated, that Children were present during a domestic violence incident in the home, and that Mother assaulted a social worker in the home during the Children's emergency removal. A Disposition Hearing occurred in September 2022, and the Disposition Order was entered September 19, 2022. There was no appeal of the DNA decision. A child support order was also entered, which ordered Mother to pay $30 per month per child.

At a review hearing on May 18, 2023, the family court waived further reasonable efforts and changed the goal from return to parent to adoption at the request of the Cabinet. At this point, Mother had not provided proof of completion of any case plan tasks, had not set up a visitation schedule, had not visited with Children, refused to provide her address to the Cabinet, and refused to sign any

additional case plans. An additional review date occurred in October 2023, where no further progress was noted.

The Cabinet filed its Petitions for Involuntary Termination of Parental Rights on December 11, 2023. Mother was appointed counsel, but she fired this attorney and retained private counsel in February 2024. A final hearing was scheduled for July 19, 2024. On that date, Mother informed the family court she wished to fire her private counsel and continue the hearing, as she did not believe her counsel was acting in her best interests. Father[2] also requested a continuance. Over the objection of the Cabinet and the Guardian *ad Litem* (GAL), the family court granted the continuance but made it clear to all parties that no further continuances would be granted. Private counsel was allowed to withdraw. Mother was appointed new counsel.

Prior to the final hearing, Mother filed two motions to be heard on December 17, 2024. The first motion was to again continue the final hearing. Mother had recently been released from incarceration on shock probation from her Third-Degree Assault sentence and wanted more time to show her stability. Additionally, Mother filed a motion to dismiss for the court's failure to hold the

---

[2] Father of the Children also participated in the underlying termination action and had his parental rights terminated, but he has not filed an appeal. Father was incarcerated throughout the underlying proceedings.

final hearing within six months of the filing of the petition, in violation of KRS[3] 625.050(7). The family court denied both motions.

The final hearing began on January 30, 2025, and concluded on April 4, 2025. The family court entered Orders terminating both parents' parental rights to Children on April 28, 2025. After the orders were entered, Mother filed a timely *pro se* Notice of Appeal. She again fired her appointed counsel and informed the family court she wished to hire private counsel. Mother filed a Motion to Proceed *in Forma Pauperis* on May 27, 2025, so the family court appointed appellate counsel for Mother "sua sponte and in an abundance of caution."[4] Counsel filed an *Anders* brief, and Mother filed her own supplemental brief. Additional facts and testimony will be set forth below as necessary.

## STANDARD OF REVIEW

This Court's standard of review of a termination of parental rights case is the clearly erroneous standard in CR[5] 52.01. The factual findings must be supported by clear and convincing evidence. *M.E.C. v. Commonwealth, Cabinet for Health and Family Services*, 254 S.W.3d 846, 850 (Ky. App. 2008). The findings of the trial court should not be disturbed unless there exists no substantial

---

[3] Kentucky Revised Statutes.

[4] Order of June 6, 2025, Trial Record (TR) at page 283.

[5] Kentucky Rules of Civil Procedure.

evidence in the record to support its findings. *V.S. v. Commonwealth, Cabinet for Human Services*, 706 S.W.2d 420, 424 (Ky. App. 1986). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004).

**ANALYSIS**

Mother's counsel argues this Court could find error because the final hearing took place outside of the six-month window outlined in KRS 625.050(7). KRS 625.050 is titled "Requirements and conditions of petition," and section (7) states: "Any petition filed pursuant to this section shall: . . . (b) Be fully adjudicated and a final judgment shall be entered by the court within six (6) months of the service of the petition on the parents."

It is generally true that "Kentucky courts require strict compliance with statutory provisions governing the involuntary termination of parental rights." *P.C.C. v. C.M.C., Jr.*, 297 S.W.3d 590, 592 (Ky. App. 2009) (citing *Day v. Day*, 937 S.W.2d 717 (Ky. 1997)). There are exceptions, particularly when the error complained of was due to the actions of the one doing the complaining.

In *D.H. v. Cabinet for Health and Family Services*, 640 S.W.3d 736, 738 (Ky. App. 2022), a father appealed the termination of his parental rights to his children. One of the challenges to the termination was the trial court's failure to

issue a decision regarding termination within thirty days following the conclusion of the hearing as required by KRS 625.090(6). *Id.* at 742. Instead, the trial court took more than two months to issue an order. *Id.* This Court determined "the statute serves merely as means to expedite permanency for children." *Id.* We also determined the delay was harmless error as the father suffered no prejudice by the delay. *Id.* at 742-43.

We find likewise here. Mother has not shown how she was prejudiced by the delay that she insisted upon or how the result might have been different. Mother's actions caused the delay. The hearing was initially scheduled for July 19, 2024, within the six-month timeframe from when Mother was served with the petitions. It was Mother who moved to continue the hearing, and the family court (reluctantly) did so over the objection of the Cabinet and the GAL.

"[A] party is estopped from asserting an invited error on appeal." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 37 (Ky. 2011). "[I]nvited errors that amount to a waiver, *i.e.*, invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review." *Id.* at 38. The delay provides no grounds to vacate the family court's orders in this case.

As for the merits of Mother's arguments, pursuant to the guidance provided in *A.C. v. Cabinet for Health & Fam. Servs.*, *supra* at 371, "this Court will fully examine the record and decide whether the appeal is wholly frivolous

pursuant to *Anders* . . . ." Here we have the *Anders* brief as well as the *pro se* filing by Mother. We have considered both.

KRS 625.090 is the controlling statute regarding the involuntary termination of parental rights. This statute allows parental rights to be involuntarily terminated only upon findings, based on clear and convincing evidence, that (1) the child has been found to be an abused or neglected child as defined in KRS 600.020(1) by a court of competent jurisdiction; (2) that the Cabinet has filed a petition seeking the termination of parental rights pursuant to KRS 620.180 or KRS 625.050; (3) that termination is in the child's best interests; and (4) at least one of the grounds set out in KRS 625.090(2)(a)-(k) is present.

The first prong is that Children must have been found to be abused or neglected. KRS 600.020(1) defines an "abused or neglected child" as "a child whose health or welfare is harmed or threatened with harm" with a list provided of examples. Mother contends in her *pro se* brief that she did not neglect or abuse Children. She argues the medical evidence clearly shows her younger Child did not have either genital warts or Hand, Food, and Mouth disease, which were the initial allegations. She believes these termination actions were in retaliation for her assault of Scipoini.

Mother is correct that the rash her daughter had was not as alarming as initially believed by the Cabinet. Children's foster mother testified the child had

molluscum, which was treated with a topical ointment. Although not as serious as herpes or some other conditions which it might have been, it still took about six months to completely clear up.

The rash was not the sole basis for the emergency removal or for the family court's finding of abuse or neglect in the underlying DNA action. The family court also found the Children were left unsupervised, that they witnessed domestic violence in the home, and that they were present when Mother assaulted a Cabinet worker. While Mother now disputes these findings, the adjudication occurred in July 2022, and the Disposition Order was entered in September 2022. The time to appeal the finding of abuse or neglect was immediately after the entry of the Disposition Orders. Any appeal as to these findings is now untimely.

Case law is clear that a family court is permitted to use findings made in prior adjudications in establishing a basis for later terminations. *M.A.B. v. Commonwealth Cabinet for Health & Fam. Servs.*, 456 S.W.3d 407, 412-13 (Ky. App. 2015). Further, the family court here made its own findings in its Findings of Fact and Conclusions of Law, and those findings are not clearly erroneous. The first prong is satisfied in this case.

Next, the court must find that at least one of the grounds outlined in KRS 625.090(2) is present. The family court in this action found these grounds applied:

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

. . .

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child;

. . .

(j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights.

The facts supporting a finding under subsection (j) are undisputed.

The Children were removed in May 2022 and the petitions for termination were filed in December 2023, clearly meeting this requirement. The Children remained out of Mother's care from removal until termination.

Mother could argue that there might be room to debate the other findings, specifically the "no reasonable expectation of improvement" factor. There was undisputed testimony that subsequent to Children's removal, Mother

-11-

has given birth to twins, who were approximately one year of age at the time of the final hearing in these cases about her older children. The twins had not been removed from her care as of the date of the termination hearing. This could indicate that Mother is perhaps capable of improvement. She was also employed. Yet Mother also testified her current residence would not be suitable for her having custody of all four children. She testified to having several residences throughout the life of this case, including a time spent at the Salvation Army shelter in Louisville. Regardless, only one finding is required to support termination. The second prong has been met.

The final consideration is the "best interest" standard. In determining the best interest of Children and the existence of a ground for termination, the family court must consider the factors in KRS 625.090(3), which are:

(a) Mental illness as defined by KRS 202A.011(9), or an intellectual disability as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time;

(b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family;

(c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring

reasonable efforts have been substantiated in a written finding by the District Court;

(d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;

(e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and

(f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.

The family court found it was in Children's best interests to terminate Mother's parental rights. At the time of the hearing, the Children had been outside of Mother's care for three years, a majority of their lives. The Children have been in the same foster home since removal, and it is an adoptive home. The foster mother as well as the ongoing Cabinet workers testified Children were doing very well in their placement, that they were meeting all their developmental milestones, and were bonded with the foster family. There was testimony that Mother was not cooperative in setting up a visitation schedule to visit with the Children in person, and she often missed virtual visits.

The family court found the Cabinet rendered all reasonable services, but those services were not utilized. Mother herself testified that she signed the initial case plan but subsequently revoked that agreement. She stated she told the

Cabinet workers she was not going to do the tasks on her case plan. Mother believed she should be able to agree to a case plan only if Children were returned to her first.

Mother did not start working on any tasks on her case plan until after the termination petitions had been filed, over a year after the Children had been removed from her care. Mother did complete parenting classes but not until March 2024, almost two years after Children were removed. There was some dispute as to whether she completed any other tasks; Mother maintains she completed her psychological assessment and did therapy sessions and testified as to where those services were obtained, but no documentation was ever provided.

Mother's testimony about her case plan work was at times hard to follow and inconsistent. For example, she initially testified she stopped attending her BIP classes because it was not helpful to her criminal case, but she later stated she was unable to finish those classes because she was incarcerated. She also testified she could not afford to complete the classes because the program stopped accepting her insurance.

There were other inconsistencies in Mother's testimony. Mother insisted that no domestic violence incidents had occurred since Children were removed. Yet both she and her twins' father filed competing Emergency Protective Order (EPO) petitions against one another. The twins' father testified at

the termination hearing, where he claimed there was no domestic violence. He then inconsistently admitted that the statements in his EPO petition were accurate in which he alleged he did not feel safe around Mother and was scared for his children's safety.

Further supporting the family court's findings and conclusions, Mother refused to provide her address to the Cabinet worker, so a home visit never occurred. Finally, while Mother testified she did pay some child support throughout the case, the family court found that only one payment had been made.

Mother strenuously argues that this case was not handled properly and that her children should have been returned when it was determined the child's rash was not herpes or Hand, Foot, and Mouth disease. She claims, "things could have been done differently." That could be true. The rash in this instance fortunately was not what the Cabinet initially feared. It turned out to be a relatively minor and common skin condition for children that improved over time with treatment.

We cannot look at that issue in isolation. It is all Mother's actions subsequent to the removal that led to the termination. Mother can argue the initial removal was unnecessary. Nevertheless, that does not justify Mother's assault of Scipoini, an assault violent enough to require staples to her scalp. Mother was uncooperative from the beginning; she initially refused to do any tasks on the case

plan until her children were returned to her custody. Then, an ongoing worker testified that Mother would only agree to do a task if she immediately got a concession in return. Mother sought to control the process. She repeatedly understated any responsibility she had in the course of events that led to the termination. She was unable to show stability, having multiple residences over the course of the case, and she testified that her current residence would not be appropriate for all four of her children.

Ultimately, "an appellate court is obligated to give a great deal of deference to the family court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them." *Cabinet for Health & Fam. Servs. v. K.H.*, 423 S.W.3d 204, 211 (Ky. 2014). "As the fact-finder, the court had sole discretion to determine the quality, character, and substance of the evidence and the sole duty to judge the credibility of the witnesses." *Ball v. Tatum*, 373 S.W.3d 458, 465 (Ky. App. 2012) (citations omitted). When testimony is conflicting, "we will not substitute our decision for the trial court's judgment." *Id.*

**CONCLUSION**

The findings of the family court pursuant to KRS 625.090 are not clearly erroneous, and it did not abuse its discretion. For the foregoing reasons, the orders of the Warren Family Court are AFFIRMED as to the Children herein.

ALL CONCUR.

*ANDERS* BRIEF FOR APPELLANT:

Stacy Hullett Ivey
Bowling Green, Kentucky

SUPPLEMENTAL BRIEF FOR
APPELLANT:

K.R.W., *pro se*
Louisville, Kentucky

BRIEF FOR APPELLEE CABINET
FOR HEALTH AND FAMILY
SERVICES:

Leslie M. Laupp
Covington, Kentucky

BRIEF FOR APPELLEE
GUARDIAN *AD LITEM*:

Rebecca A. Simpson
Bowling Green, Kentucky